IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA

VERSUS                                                              CRIMINAL NO. 1:08cr130WJG-RHW

EDDIE JAMES PUGH IV (1);
BARRON LECOUR BORDEN (2); AND
TORENDA WHITMORE (3)

O R D E R

THIS CAUSE is before the Court on motions of Defendants Eddie James Pugh IV [62, 66, 97]; Barron Lecour Borden [75, 99]; and Torenda Whitmore [49, 94] to suppress physical evidence and statements. These Defendants are jointly charged in a seven-count indictment with various offenses stemming from an incident which occurred on or about October 8, 2008. (Ct. R., Doc. 42.) A hearing on these motions was held on March 6 and 9, 2009. (Ct. R., Minute entry and Docs. 92-93.)

On October 8, 2008, the Jackson County sheriff's department responded to a 911 call concerning a vehicle on fire. When the fire was extinguished, the officers found a body inside the vehicle. A witness identified a silver Scion as involved in the crime, and officers found Torenda Whitmore in the area of the crime driving a silver Scion.

Another 911 call reported several black males running and shooting at another black male in the area. The deputies found a victim of gunshot wounds alive in a ditch, and that person was transported to a nearby hospital. The deputies searched further and found Eddie James Pugh IV

and Barron Lecour Borden near a bridge in the area. The shooting victim, Rahman Mogilles, summarized the circumstances leading to his injury which apparently had begun in New Orleans, Louisiana allegedly at Pugh's house. The individuals were either transported to the Jackson County sheriff's department substation in St. Martin, Mississippi, to be interviewed, or, in Borden's case, to the hospital for treatment to the wounds he had suffered. (Ct. R., Doc. 96, p. 7.)

As a result of information provided by 911 calls, independent observations by police officers at the scene, and other investigations and interviews, Defendants were charged with the crimes contained in the indictment in this case, which include conspiracy to commit kidnaping, kidnaping, aiding and abetting kidnaping, possession of a firearm by a convicted felon and in conjunction with a crime of violence, and finally criminal forfeiture. (Ct. R., Doc. 23.)

Each of the Defendants filed a motion to suppress. The Court will address each individuals' assertions regarding the need for the suppression of any statements or evidence separately.

I.      Torenda Whitmore

Whitmore asserts that any statements she made on October 8, 2008, to law enforcement officials should be suppressed because the statements were involuntary, obtained through promises, and without a waiver of her rights as required under *Miranda*[1]. (Ct. R., Doc. 49, pp. 1-2.) Whitmore contends she was seized by Jackson County deputies and taken to the sheriff's department where she was told she was going to get the death penalty is she did not cooperate with law enforcement. (Ct. R., Doc. 49, Exh. A., p. 1.) She further asserts that she was told she would be allowed to go home if she gave a statement, and was not told she was under arrest.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

(*Id*.) She claims in her affidavit that her rights were not explained to her and the only reason she gave statements to the officers was because she understood that she would be allowed to leave after she made those statements. (*Id*., p. 2.)

She claims that she was never arrested or charged with a crime when she was taken out of her car at gunpoint on October 8, 2008. (Ct. R., Doc. 94, p. 1.) She contends that there was no evidence that she had committed a crime and there were no reasonable grounds to conclude that she had committed a crime in connection with these events. (*Id*.) Accordingly, Whitmore claims the sheriff's department did not have probable cause to arrest her. (*Id*., p. 4; Exh. D-6.) She claims that her statement made at 5:24 P.M., on October 8, 2008, was the fruit of the poisonous tree due to her illegal arrest, and contends that the statements should be suppressed. (*Id*., p. 5.)

One witness' statement provides that a tan sport utility vehicle [SUV] was stopped on LaRue Road in Latimer, Mississippi, on October 8, 2008, with a silver car about 30 feet behind it. (Ct. R., Exh. G-4.) Both vehicles were facing northeast. (*Id*.) Three black males were standing behind the SUV, when suddenly one of them ran into the woods. (*Id*.) The other two men chased the first man, firing at least two or three shots at the man. (*Id*.) The witness backed up the road and immediately called 911 upon arriving back at the witness' house. (*Id*.)

Another witness traveling down LaRue Road saw a SUV parked in the road, with a silver car parked about 20 feet behind the SUV. (Exh. G-S.) The witness also saw three black men standing behind the car, then one of the men started running towards the woods. (*Id*.) The other two men followed in pursuit, and one of the two men in pursuit shot at the man who was running. (*Id*.) While the witness was calling the Jackson County sheriff's office, the silver car which was observed behind the SUV was turning into the witness' driveway. (*Id*.) The car backed out and

went back down LaRue Road. (*Id.*) Another witness observed Rahman Mogilles in a ditch with gunshot wounds to his back and buttocks. (Ct. R., Doc. 1, p. 3.)

When she was interviewed, Whitmore told investigators that Pugh was her boyfriend, and that they lived together at Pugh's mother's house in New Orleans. (Ct. R., Doc. 96, pp. 10, 12.) Mogilles came to the house where she and Pugh were living and there was a confrontation between Pugh and Mogilles about something. (*Id.*, p. 12.) Shortly after the confrontation, Pugh asked Whitmore to follow him in the Scion. (*Id.*, p. 13.) She allegedly witnessed the scuffle on LaRue Road between Pugh, Borden and Mogilles just before Mogilles bolted towards the woods. (*Id.*, p. 14.)

Whitmore contends that the statements made by her to police officers in the course of investigating the incident at issue should be suppressed for several reasons. First, she claims she was not Mirandized, although evidence to the contrary was presented to the Court. Second, she claims that she asked for an attorney to be present during questioning, and this request was denied. Video of the interview shows otherwise. Third, she claims that because she was illegally arrested by the Jackson County sheriff's department at the scene of the alleged crime, her subsequent statements to the officers should be suppressed.

Lieutenant Ken McClenic testified that he responded to a possible crime scene on October 8, 2008, in the LaRue Road area. (Ct. R., Doc. 104, p. 5.) He found a vehicle which had been burned with a body inside of it, and another vehicle parked out in the road which was occupied by Torenda Whitmore. (*Id.*, p. 6.) A witness had seen her vehicle following the vehicle which contained the body. (*Id.*, p. 7.) She told McClenic she was lost and trying to find her way

back to the interstate. (*Id*.) During the conversation, other deputies found a victim with gunshot wounds near the woods which were close by. (*Id*.)

McClenic testified that he explained the Miranda rights to Whitmore prior to questioning her at the Jackson County sheriff's department substation on Highway 609 in St. Martin, Mississippi. (*Id*., pp. 10-11, 14.) McClenic identified the exhibit marked as D-1 as a copy of the version of the events which happened that day which Whitmore wrote for him during the questioning. (*Id*., p. 13.) The custody form, signed by McClenic, provides that Whitmore was arrested on LaRue Road at 15:42. (Exh. D-6.)

He stated he did not tell Whitmore she would be able to go home after giving her statement. (*Id*.) He testified that she did not ask to consult with an attorney. (Ct. R., Doc. 104, p. 13.) He stated that Whitmore was not being charged with a crime at the time of her questioning. (*Id*., p. 19.) He testified that Whitmore was sitting in her car about 25 feet from a vehicle which had been burned and contained a dead body. (*Id*., p. 30.)

Whitmore asserts in her motion to suppress that she was arrested and not totally advised of the reason for the arrest. (Ct. R., Doc 49, p. 1.) She claims in her motion that she was promised she would be released immediately if she cooperated and that the promises amounted to coercion making her statements involuntary. (*Id*., p. 2.) She claims she could not knowingly and intelligently waive her *Miranda* rights because it was the first time she was ever arrested and she was unfamiliar with the criminal justice process. (*Id*.)

According to the United States, a written waiver shows that Whitmore voluntarily waived her *Miranda* rights. (Ct. R., Doc. 83, p. 5.) In addition, there is a video and audio recording of the interview which establishes that Whitmore received her *Miranda* rights and voluntarily

waived those rights. (*Id*.) Whitmore stated on a video of the interview that she was not promised anything in return for her statements. (Ct. R., Doc. 84.) She did not invoke her right to counsel in the video. (*Id*.)

Jerome Lorrain, a case agent with the Federal Bureau of Investigation [FBI], testified that he administered *Miranda* warnings to Whitmore at the Jackson County substation on October 8, 2008. (Ct. R., Doc. 96, pp. 8-9.) Lorrain provided that Whitmore indicated she understood her rights and agreed to answer questions without the presence of attorney. (Ct. R., Exh. G-1.) She also signed the waiver form at 5:24 P.M., and indicated that she understood her rights. (*Id*.; Ct. R., Doc. 96, p. 10.)

The United States contends that even if the detectives said something misleading to Whitmore in the course of the interview, the statements offered should not be suppressed. (Ct. R., Doc. 83, p. 6.) When looking at the totality of the circumstances, the United States asserts that Whitmore was advised of her constitutional rights and waived them. (*Id*.)

An arrest made without a warrant is permissible provided the officers had probable cause to suspect the person arrested is involved in criminal activity. *United States v. Costner*, 646 F.2d 234, 236 (5th Cir. 1981). The Court finds that the tips provided by witnesses, including a statement that the Scion Whitmore was driving was seen following the SUV which was found partially burnt with a dead body inside, along with the descriptions of the crime scene given by 911 callers provided sufficient probable cause to allow for the arrest and detention of Whitmore. *United States v. Sokolow*, 490 U.S. 1, 9 (1989); *United States v. Holloway*, 962 F.2d 451, 459-60 (5th Cir. 1992). The Court finds no reason to suppress Whitmore's statements.

Whitmore was arrested on the scene, according to police records. (Exh. D-6.) The Court must determine whether the Fourth and Fourteenth Amendments to the United States Constitution were violated when Whitmore was taken into custody. The seizure of a person must be supported by probable cause to comport with Fourth Amendment protections. *Dunaway v. New York*, 442 U.S. 200, 215-16 (1979); *United States v. Shugart,* 117 F.3d 838, 846 (5th Cir. 1997). "Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *United States v. Ramirez,* 145 F.3d 345, 352 (5th Cir.1998).

In this case, on October 8, 2008, police officers responded to a 911 call which identified shots fired at a fleeing man by two males, a silver car following a SUV, which was burnt and found to contain a body, an individual who had been shot twice who was found nearby, and Whitmore in a silver car not far from the location of these events. (Ct. R., Exhs. G3 and G4; Doc. 96, pp. 6, 162, 182-3.) The combination of these facts was sufficient to give the officers probable cause to believe Whitmore was connected to the shooting of one individual and death of another person found in the SUV. *See Harper v. Harris County, Texas,* 21 F.3d 597, 601 (5th Cir. 1994). The Court finds that the officers had probable cause to arrest Whitmore for these offenses, and that her post-arrest statements resulted from a lawful, rather than unlawful, arrest. *United States v. McCowan*, 469 F.3d 386, 390 (5th Cir. 2006). The Court further concludes that Whitmore's motion to suppress her statements should be denied.

Whitmore also contends that she invoked her Fifth Amendment right to counsel. The Court finds no evidence that Whitmore sought representation of counsel during the interrogation

on October 8. All evidence supports the finding that *Miranda* rights were read to Whitmore by McClenic and Lorrain, and that Whitmore waived her rights and voluntarily offered statements. (Ct. R., Exh. G-1; Docs. 83, Exh. A and 83-3.) In addition, the Court finds that she did not invoke her right to counsel at any time.

If she had invoked her Sixth Amendment right to counsel, she was guaranteed under that Amendment "at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between [she] and the State." *Maine v. Moulton*, 474 U.S. 159, 176 (1985). This right was not triggered until " a prosecution is commenced." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). No prosecution was started at the time she was questioned and the Court finds no reason to suppress her statements based on her arguments to the contrary. Accordingly, the Court concludes that Whitmore's motion to suppress and supplemental motion to suppress should be denied.

II.     Eddie James Pugh IV's Motions to Suppress

Pugh filed motions to suppress statements and to physical evidence. (Ct. R., Docs. 63, 80.) Each of these assertions will be addressed by the Court.

    A.     Suppression of Statements

In his motion to suppress statements, Pugh contends he was not effectively advised of his right to have an attorney. (Ct. R., Doc. 63, p. 11.) He claims that he was told that he was facing a capital murder charge which could result in the death penalty. (*Id.*, p. 14.) He further contends that he was told that the only way to avoid the death penalty was to provide a statement so that the case could be charged in federal, rather than state court. (*Id.*) As a result, he claims that his resulting statement was not voluntary. (*Id.*)

Pugh also asserts that his statements made on October 10, 2008, were not the result of an intelligent or voluntary waiver. (*Id.*, pp. 14-15.) He claims he was deprived of needed medication and that he was kept in isolation while he was kept at the Jackson County Adult Detention Center [JCADC]. (*Id.*, p. 14.) Pugh claims that Lorrain advised him that his mother, Sheila Stallworth, indicated that she wanted Pugh to cooperate and speak to Lorrain. (*Id.*, p. 15.) Pugh contends that his statements were not voluntary and were a product of coercion. (*Id.*)

Pugh contends that he was arrested at 4:00 P.M., on October 8, 2008, and transported to the JCADC. (Ct. R., Doc. 63, p. 5.) He claims he was badgered by Jackson County officers and threatened. (*Id.*, pp. 5-9.) He further claims he was taken for an examination by a physician because of injuries, but was not given his necessary prescription medication. (*Id.*, p. 9.) He also contends that he was cold, because he had been left in wet clothing and later allegedly left naked in his cell, and this condition was part of the coercion he endured. (*Id.*, p. 6.)

Pugh asserts that he was told by Jackson County officials that he would not be able to obtain an attorney unless he hired one himself. (*Id.*, p. 11.) He claims he kept telling the officers that he did not understand his rights as they were read to him, but those rights were never clarified. (*Id.*) Pugh alleges that because he was advised that the only way he could avoid a possible death penalty based on a state capital murder charge was to cooperate and provide a statement to the federal authorities, he was coerced into making statements to law enforcement officials. (*Id.*, p. 14.) He contends that Lorrain coerced him into making a statement by mentioning that Pugh would be taken out of isolation, he would have the specter of the death penalty removed from his future, and that he would be allowed to speak to his mother. (*Id.*, p.

15.) For these reasons, Pugh claims that his decision to sign a waiver of rights form was not voluntary. (*Id*.)

The United States contends that Pugh's statements were voluntarily given. (Ct. R., Doc. 76, p. 6.) Pugh has a substantial criminal history, which the United States contends shows that Pugh understood his rights. (*Id*., pp. 9-10.) In addition, the United States argues that a waiver of rights has been found valid in spite of a defendant's physical condition including being chilled, wet, hungry, pain and dizziness, among other conditions. (*Id*., pp. 10-11.)

Lorrain properly administered the *Miranda* warnings at the time Pugh was interviewed on October 10, 2008. (*Id*., p. 14.) This second waiver validates the statements made by Pugh to Lorrain, according to the United States. (*Id*., p. 16.) The United States argues that Pugh never invoked his right to counsel, but rather he agreed to answer questions without the presence of an attorney. (*Id*., p. 17, Exhs. C, D, & E.) Questions about how to obtain an attorney and even whether an attorney should be present are not considered to be an assertion of the right to an attorney, according to the United States. (*Id*., p. 18.)

A defendant must be apprised of the constitutional right against self-incrimination and validly waive this right in order for statements made by that defendant while in police custody to be admissible. *Miranda*, 384 U.S. at 478-9; *United States v. Braithwaite*, 458 F.3d 376, 382 (5th Cir. 2006). The defendant must show that he was in custody while being interrogated. *United States v. Wells*, 755 F.2d 382, 390 (5th Cir. 1985). There is no doubt that Pugh was in custody at the time of the questioning. (Ct. R., Doc. 89-2.) After the defendant shows that he was in custody, the United States must show that the defendant knowingly, voluntarily and intelligently waived his Fifth Amendment rights. *North Carolina v. Butler*, 441 U.S. 369 (1979).

In this case, the United States submitted a waiver of rights form which was signed by Pugh at 10:51 P.M., at the Jackson County substation on October 8, 2008. (Ct. R., Doc. 76-2.) In addition, Lorrain testified that he read Pugh his rights on October 10, 2008. (Ct. R., Doc. 96, p. 92.) A signed waiver of rights form dated October 10, 2008, was provided by the United States. (Ct. R., Doc. 76-3.) A third signed waiver of rights dated October 11, 2008, is included and provides that it was completed at Old Biloxi Road and LaRue Road. (Ct. R., Doc. 76-4.) Lorrain testified that he did discuss certain scenarios with Pugh concerning possible state charges; arrangements for Pugh and Whitmore to visit; and statements made by Pugh's mother, Sheila Stallworth, concerning Pugh's level of cooperation with the authorities. (*Id*., pp. 99-103.) These types of things do not amount to coercion making Pugh's statements involuntary. *United States v. Bell*, 367 F.3d 452, 461-2 (5th Cir. 2004).

In determining whether a person who received a *Miranda* warning has validly waived these rights, the court should consider the following:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only it the "totality of the circumstances surrounding the investigation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights were waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).

The court may consider the background, experience and conduct of the accused in determining if the waiver was knowing and intelligent. The Court concludes that Pugh voluntarily and intelligently waived his rights. He had received *Miranda* warnings several times before speaking to law enforcement officials. (Ct. R., Docs. 76-2, 76-3, 76-4.) Pugh signed a

waiver of rights each time those warnings were given. (*Id*.) Lorrain's testimony was that Pugh was not offered any promises and that he did not coerce Pugh into waiving his rights, which the Court finds to be credible evidence. *Colorado v. Spring*, 479 U.S. 564, 576. (1987); *United States v. Cardenas*, 410 F.3d 287, 292-3 (5th Cir. 2005). In addition, Pugh had extensive experience with law enforcement[2] and nothing in the record indicates that he lacked average intelligence or education. *United States v. Hearn*, 2009 WL 607350, 6 (5th Cir. 2009). The Court, therefore, concludes that Pugh voluntarily waived his rights in making the statements to the officials.

Pugh also asserts that his statements should be suppressed because of the delay between the time of his arrest and his appearance before a federal magistrate judge. (Ct. R., Doc. 97, p. 1.) He claims that the FBI was deeply involved in the investigation of this case as evidenced by the man hours spent by federal agents investigating and interviewing suspects in this case. (*Id*., p. 3.) Lorrain directed the search at Stallworth's New Orleans home. (*Id*.) Through the information obtained from Pugh and his mother, the officers were able to obtain confessions and discover evidence that the initial investigation did not garner. (*Id*.) Pugh asserts that the state and federal agents worked in conjunction with each other in this investigation, and that the level of federal involvement shows a collusive relationship between federal and state agents which triggers the need to bring the defendant before a federal magistrate judge within six hours of his arrest. (*Id*., pp. 1-4.)

The United States contends that the circumstances of this case do not show the necessary collusion between state and federal authorities needed to trigger Federal Rule of Criminal

---

[2]Ct. R., Doc. 96, pp. 45-6.

Procedure 5(a) and 18 U.S.C. § 3501. (Ct. R., Doc. 102, p. 2.) Collusiveness is generally found only where local officials are acting solely at the behest of federal officials, according to the United States. (*Id.*, pp. 2-3.)

18 U.S.C. § 3501 governs the admissibility of confessions in federal prosecutions. Under 18 U.S.C. § 3501(c), a custodial confession made by a person within six hours following his arrest is not admissible because of delay in bringing the person before a federal magistrate judge on federal charges. *United States v. Alvarez-Sanchez*, 511 U.S. 350, 351-2 (1994). In other words, a duty to present a person to a federal magistrate judge does not arise until the person has been arrested for a *federal* offense. See FED. R. CRIM. P. 5(a) (requiring initial appearance before a federal magistrate judge). Until a person is arrested or detained for a federal crime, there is no duty, obligation, or reason to bring him before a judicial officer "empowered to commit persons charged with offenses against the laws of the United States," and therefore, no "delay" under section 3501(c) can occur. *United States v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994); *see also United States v. Romano*, 482 F.2d 1183 (5th Cir. 1973) .

At the time of Pugh's statements, he was in custody on state charges. The federal complaint and warrant were not issued in this case until October 14, 2008. (Ct. R., Docs. 1-4.) Until that time, Pugh was in custody solely on state charges. *See United States v. Watson*, 591 F.2d 1058, 1062 (5th Cir. 1979) (holding that section 3501(c) did not apply until a defendant who was being held in custody by state officials on a state charge of bank robbery was taken into federal custody even though a federal warrant had issued based on the same offense prior to the defendant's arrest by state officials).

Pugh contends that the officers were working in a collusive relationship in investigating the case which falls under an exception to the general rule that section 3501(c) and Rule 5 of the Federal Rules of Criminal Procedure do not apply to an individual in custody solely on state charges. In this case, there simply is no evidence that Pugh was held by state authorities merely to allow the federal agents to question him without complying with federal statutes. *See Alvarez-Sanchez*, 511 U.S. at 360. The record reveals no such improper collaboration in this case, as Pugh has not established that he was held in state custody merely to allow federal agents to question him without complying with either Rule 5 of the FEDERAL RULES OF CRIMINAL PROCEDURE or 18 U.S.C. § 3501(c). The only evidence before the Court is that of nothing more than "routine cooperation between local and federal authorities," which is "wholly unobjectionable." *Alvarez-Sanchez*, 511 U.S. at 360.

The statements and evidence applicable to this case were made by Pugh well beyond six hours following his arrest on state charges, as Pugh seeks to suppress statements made on October 10, 2008, and physical evidence found on October 11, 2008. (Ct. R., Doc. 97, p. 3.) Defendants were arrested on federal charges on October 14, 2008, and later brought before the federal magistrate judge. (Ct. R.) The Court finds that section 3501(c) does not apply in this case, as Defendants were not charged with a federal crime until the arrest. In addition, the Court finds that any delay between the arrest and appearance before the federal magistrate judge was reasonable, as the delay was not a result of any action on the part of the federal authorities. (Ct. R., Docs. 16-18.) The Court, therefore, concludes that any statements and evidence presented by Pugh should not be suppressed based on an alleged delay in presenting him to the federal magistrate judge in this case. *See United States v. Hall*, 152 F.3d 381, 425-6 (5th Cir. 1998).

B. <u>Suppression of Physical Evidence</u>

Pugh also asserts that certain physical evidence should be suppressed. (Ct. R., Doc. 67.) Following Whitmore's interview, Lorrain called the Safe Streets Task Force in New Orleans to advise them that the crime being investigated in Mississippi had initiated in New Orleans. (Ct. R., Doc. 96, p. 17.) Lorrain requested that Pugh's mother's house be placed under surveillance until a search warrant for the residence could be obtained. (*Id*.) On the evening of October 8, 2008, law enforcement officials from New Orleans went to Stallworth's home at 5801 Waterford in New Orleans, Louisiana. Stallworth stated in an affidavit that Pugh and Whitmore were living with her on that date. (Ct. R., Doc. 88-2, p. 1.)

When Lorrain arrived in New Orleans, task force members were outside the home with Stallworth. (Ct. R., Doc. 96, p. 19.) Lorrain provided facts to Edward Johnson, a task force agent and Johnson prepared an affidavit to present to a judge for a search warrant for the home. (*Id*., pp. 19-20.) Lorrain testified that he told Stallworth that a murder had been committed and that a search warrant was being sought for her home in connection with these events. (*Id*., p. 20.) Lorrain also advised Stallworth that the officers needed to sweep the home to make sure there were no other persons were in the residence. (*Id*.) The search was conducted in Stallworth's presence, during which evidence was noted in particulars areas in the home. (*Id*., p. 21.)

Lorrain testified that the actual search of the home was not initiated until word was received from Johnson that the search warrant was signed at 2:10 A.M. (*Id*., p. 22.) Lorrain stated that the search of the home was not begun until the warrant was signed. (*Id*.) The crime scene investigation report indicates that the technician arrived at the scene at 12:25 A.M., on October 9, 2008. (Exh. D-3.) According to the narrative of the investigation, Lorrain told New

Orleans police officials that an individual had been murdered and another person was shot in Mississippi, and that the victims had allegedly been beaten, bound and kidnaped from Stallworth's home. (*Id.*) Following the search, Stallworth was provided a receipt for items collected in the search. (*Id.*)

Stallworth stated she went to a convenience store at 10:00 P.M., where she was approached by an officer with the New Orleans Police Department. (Ct. R., Doc. 96, p. 189.) The officer asked to accompany her to her home, and when they arrived at the house, several police cars had arrived at her home. (*Id.*, p. 192.) She stated that she was not allowed to move about the house. (*Id.*, p. 195.) She indicated that Lorrain seemed to be in charge of the operations at her home, and spent a good deal of time with her. (*Id.*, pp. 197-203, 229.)

Lorrain called her on October 10, 2008, and allowed her to speak to her son. (*Id.*, p. 202.) Pugh was rambling and his mother was uncertain about what Pugh was trying to say to her. (*Id.*, p. 204.) Lorrain called Stallworth again that day, saying he needed to come back to her house to look for something. (*Id.*) Stallworth arranged to meet Lorrain at the house at a certain time, with Lorrain advising her not to go into the house and look around or she would be considered to be tampering with evidence. (*Id.*, p. 205.) She testified that she had worked for a judge and knew "how the system works." (*Id.*, p. 219.)

Stallworth testified that she let the officers into her home and they found a large amount of cash in a sofa in the living room. (*Id.*, p. 207.) She signed a consent to search form. (*Id.*, p. 225; Exh. G-6.) Stallworth also signed a form acknowledging that the money was found and waiver of claim to the money. (*Id.*, pp. 207, 223; Exhs. G-7 and G-8.)

In the motion to suppress physical evidence, Pugh contends that the search conducted October 8 and 9, 2008, was not pursuant to a search warrant. (Ct. R., Doc. 67, p. 5.) Pugh contends that the officers began searching the Stallworth house shortly after 10:00 P.M., and the warrant was not signed until later. (*Id*.) Pugh claims that the officers were not authorized to enter the residence and conduct the search. (*Id*.)

Pugh asserts that the search on October 10, 2008, was not authorized by a search warrant and evidence discovered on this date must be suppressed. (*Id*., p. 6.) Pugh contends that the October 10th search was not justified because of Stallworth's consent. (*Id*.) Any consent was not valid because it was acquiescence to law enforcement assertion of authority. (*Id*., p. 7.) Pugh also claims that the items located on October 11, 2008, were the fruit of illegally obtained statements which tainted the location of the items. (*Id*.)

The United States asserts that consent searches of a house can be made without a warrant or probable cause. (Ct. R., Doc. 80, p. 5.) Although Pugh argues to the contrary, the United States asserts that Stallworth gave her consent to search her home to Lorrain on October 11, 2008, as evidenced by the fact that they met at her home at a mutually agreeable time suggested by Stallworth. (*Id*.) In addition, this information shows that she did not merely acquiesce to law enforcement authority in her consent, according to the United States. (*Id*.)

The search on October 10, 2008, at Stallworth's home was undertaken with Stallworth's consent, according to the United States. (Ct. R., Doc. 80. pp. 4-6.) Under the Fourth Amendment law, "[w]arrantless searches of a person's home are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search." *United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007). In considering

whether a consent search is voluntary, the Court may look at to the age, education and intelligence of the person giving consent to the search; whether the person was under arrest; whether she was advised of her right to refuse consent to search; and her mental and physical condition. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). The Court, having observed Stallworth during her testimony at the suppression hearing, finds that she did voluntarily consent to the search of her home on October 10, 2008, when the money was discovered. There is no reason to suppress the evidence found in that search.

The items located on October 11, 2008, with Pugh's assistance would have been discovered by agents eventually, according to the United States. (Ct. R., Doc. 80, pp. 6-7.) Pugh signed another waiver of rights after being advised again of his rights prior to the search. (*Id.*, p. 7; and its Exh. G.) There is no evidence that law enforcement officials coerced him into cooperating even though Pugh was advised to cooperate. *See United States v. Garcia Abrego*, 141 F.3d 142, 170 (5th Cir. 1998), *cert. denied* 525 U.S. 878. Pugh's actions evidence an uncoerced choice to waive his *Miranda* rights, and based on his experience, age, intelligence, and demeanor, the Court finds that choice was voluntarily and knowingly undertaken. *See United States v. Collins*, 40 F.3d 95, 98 (5th Cir. 1994), *cert. denied* 514 U.S. 1121; *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The Court further finds no reason to suppress the evidence found on October 11, 2008.

III.     Borden's Motion to Suppress Statements

Borden claims that his statements should be suppressed because he told the officers he did not want to waive his rights. (Ct. R., Doc. 75, p. 2.) The officers read him his rights but Borden refused to sign the waiver form. (*Id.*) He stated that he did not want to make a statement

but would answer questions. (*Id*.) Borden argues that he believed that as long as he did not sign the waiver form he could talk to the officers without waiving his rights. (*Id*., p. 3.)

Refusing to sign a waiver form is not enough to establish that a defendant did not waive his rights. *North Carolina v. Butler*, 441 U.S. 369, 376 (1979). "[W]aiver may be direct or inferred from the defendant's words and actions." *See United States v. Chapa-Garza*, 62 F.3d 118, 121 (5th Cir. 1995). Merely answering question, however, is not enough to show a waiver of rights. *Chapa-Garza*, 62 F.2d at 121.

At the initial interview held on October 8, 2008, Borden stated that he understood his rights. (Ct. R., Doc. 81, Exh. D.) He was asked if he had been arrested before and he answered in the affirmative. (*Id*.) He indicated that he could read and appeared to read along with the officer during the reading of his rights, however, he refused to sign the waiver and stated he just wanted to see what happened. (*Id*.) He knew he could stop the questioning at any time during the interview. (*Id*.) He told the officers to start asking him questions, and they did. (*Id*.)

Waiver of rights is effective when law enforcement officers advised the accused that he did not have to discuss the case with them, and he said okay, he was familiar with the criminal justice system as evidenced by his criminal history, and he read the form and appeared to understand the form, although he refused to sign the waiver form. *See United States v. Collins*, 40 F.3d 95, 98 (5th Cir. 1994), *cert. denied*, 514 U.S. 1121 (1995). Borden never refused to talk and spoke with the officers for an extensive period of time. The Court finds that under these circumstances Borden's conduct establishes that he waived his rights during the interview. The Court, therefore, concludes that Borden's motion to suppress should be denied.

Borden also claims that his statements should be suppressed due to delay in his presentment before the federal magistrate judge. (Ct. R., Doc. 99.) The Court has considered this argument above and found no reason to suppress statements based on 18 U.S.C. § 3501(c). The Court further finds that the motion to suppress statements and physical evidence should be denied. It is therefore,

ORDERED AND ADJUDGED that the motions to suppress [49] and supplemental motion to suppress [94] statements filed by Defendant Torenda Whitmore be, and are hereby, denied. It is further,

ORDERED AND ADJUDGED that the motions to suppress [62, 66] and supplemental motion to suppress [97] statements filed by Defendant Eddie James Pugh IV be, and are hereby, denied. It is further,

ORDERED AND ADJUDGED that the motions to suppress [75] and supplemental motion to suppress [99] statements filed by Barron Lecour Borden be, and are hereby, denied.

SO ORDERED AND ADJUDGED this the 6th day of May, 2009.

*Walter J. Gex III*
UNITED STATES SENIOR DISTRICT JUDGE