IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION


UNITED STATES OF AMERICA

VERSUS

EDDIE JAMES PUGH, a/k/a Stretch (1);
BARRON LECOUR BORDEN a/k/a Bam (2);
and TORENDA WHITMORE, a/k/a
Torenda Brooks, a/k/a Tory (3)


**O R D E R**


THIS CAUSE is before the Court on motions of the Defendants Eddie James Pugh IV,

Barron Lecour Borden, and Torenda Whitmore for judgment of acquittal [148, 144, 140,

respectively] pursuant to Rule 29 of the Federal Rules of Criminal Procedure, or in the

alternative, for a new trial [147, 145, 141, respectively].  After due consideration of the motions,

the evidence of record, the applicable law, and being otherwise fully advised in the premises, this

Court finds as follows.

Pugh was found guilty on May 15, 2009, following a jury trial, of the following crimes,

all occurring on or about October 8, 2008:  conspiring to commit kidnapping; kidnapping and

aiding and abetting the kidnapping of Byron Kelsey McCoy; kidnapping and aiding and abetting

the kidnapping of Rahman Anderson Mogilles; felon in possession of a firearm; and possession

of a firearm in connection with a crime of violence.  (Ct. R., Doc. 136.)  According to Pugh, the

evidence in this case does not support the jury verdict as rendered.  (Ct. R., Doc. 147, p. 1.)  Pugh

contends that the Court erred in admitting the Defendant's statements to law enforcement,

because they were obtained in violation of his Fourth and Fifth Amendment rights and in violation of *Miranda v. Arizona*[1]. (*Id.*) Also, Pugh maintains that the Court erred in allowing the expert testimonies of Brandon Giroux, Machelle Reid, and Maureen Bradley. (*Id.*, p. 2.) Pugh claims that he was denied his Sixth Amendment right to a fair trial and his right to confrontation when he was tried together with Borden and Whitmore. He claims that he was unable to cross examine Whitmore because she exercised her right to remain silent. (*Id.*) He further contends that his co-defendants' attorneys each made comments and arguments which were prejudicial to Pugh. (*Id.*) Additionally, Pugh maintains that the Court erred in allowing the United States to admit evidence regarding Pugh's medical treatment, because he did not consent to the treatment and because Pugh contends that he was taken for treatment purely for investigative purposes. (*Id.*, p. 3.)

Borden was also found guilty by the same jury of conspiring to commit kidnapping; kidnapping and aiding and abetting the kidnapping of McCoy and Mogilles; being a felon in possession of a firearm; and possession of a firearm in connection with a crime of violence all occurring on or about October 8, 2008. (Ct. R., Doc. 136.) Borden asserts that the evidence at trial was insufficient to sustain a conviction; and that the Court erred in sustaining any objections made by the United States, or overruling any objections made by Defendant Borden. (Ct. R., Docs. 144, 145.) Borden maintains the Court erred in not sustaining all motions filed by the Defendant and in sustaining any motions filed by the United States. (*Id.*, p. 3.) Borden also maintains that the Court erred in not granting his Motion for Acquittal in accordance to Rule 29 of the Federal Rules of Criminal Procedure. (*Id.*) Borden further contends that the Court erred in

---

[1] 384 U.S. 436, 465 n. 33 (1966).

allowing certain exhibits into evidence. (*Id*., p. 4.) Finally, Borden asserts that the Court erred in allowing the United States to raise sympathy for the deceased victim and his family. (*Id*., p. 4.)

Whitmore was found guilty by the same jury of kidnapping and aiding and abetting the kidnapping of McCoy and of Mogilles. (Ct. R., Doc. 136.) According to Whitmore, the jury verdict should be overturned due to lack of evidence to support the verdict against her. (Ct. R., Doc. 140, p. 1.) She contends that there was no confession admitted into evidence during the trial, and no eye witness to pinpoint her as committing any part or element of the kidnaping, leaving the only evidence connecting her to the crime to be circumstantial evidence. (*Id*., pp. 1-2.) She claims that in a case in which only circumstantial evidence is available, the inferences reasonably drawn from the evidence must only be consistent with guilty and must be inconsistent with every other reasonable hypothesis of innocence. (*Id*.) Mere presence at the scene of the crime is not enough to sustain a conviction as an aider and abetter to a crime, according to Whitmore. (*Id*.) Whitmore further asserts that merely driving a vehicle is not enough to prove that she had knowledge of the crime itself. (*Id*.) She claims that her version of the events, as summarized by Jerome Lorrain, a Safe Streets Task Force Agent for the Federal Bureau of Investigation [FBI], in his testimony are consistent with innocence, therefore, her motion for judgment of acquittal should be granted. (*Id*.)

Whitmore claims the Court erred in sustaining any objections made by the United States, or overruling any objections made by her, and in not sustaining all motions filed by the Defendant and in sustaining any motions filed by the United States. (*Id*.) Whitmore further asserts that the Court erred in not granting her Motion for Acquittal in accordance with Rule 29 of the Federal Rules of Criminal Procedure. (*Id*.) Whitmore claims that the Court erred in

allowing certain exhibits into evidence.  (*Id.*, p. 3.)  Whitmore maintains that the Court erred in admitting her statements to law enforcement, because they were obtained in violation of her Fourth, Fifth and Sixth Amendment rights.  (*Id.*)  Finally, Whitmore also contends that the Court erred in allowing the United States to raise sympathy for the deceased victim and his family. (*Id.*, p. 4.)

Discussion

A motion for a judgment of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, "challenges the sufficiency of the evidence to convict."  *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998).  On a motion for new trial under Rule 33 of the Federal Rules of Criminal Procedure, a new trial is granted "only upon demonstration of adverse effects on substantial rights of a defendant."  *United States v. Rasco*, 123 F.3d 222, 228 (5th Cir. 1997) (citing *United States v. Cooks*, 52 F.3d 101, 103 (5th Cir. 1995).  All evidence is viewed in a light most favorable to the United States, and all reasonable inferences and credibility choices are considered in support of the jury's verdict.  *United States v. Bishop*, 264 F.3d 535, 549-550 (5th Cir. 2001); *United States v. Kim,* 884 F.2d 189, 192 (5th Cir. 1989).  If any rational trier of fact could have found proof of the essential elements of the crime beyond a reasonable doubt, the verdict will stand.  *United States v. Carbajal*, 290 F.3d 277, 289 (5th Cir. 2002).  "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence."  *United States v. Bermea,* 30 F.3d 1539, 1551 (5th Cir. 1994).

I.      Lack of Evidence to Support the Jury Verdict

When treating a challenge to the sufficiency of the evidence to sustain a conviction, a court will not supplant the jury's determination of credibility with . . . a different assessment of credibility.  *United States v. Akpan*, 407 F.3d 360, 370 (5th Cir. 2005).  On the other hand, a conviction must be overturned if "the evidence is such that a reasonably minded jury must have a reasonable doubt as to the existence of any element of the crime, or the evidence [viewed in the light most favorable to the verdict] gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence."  *United States v. Harris*, 420 F.3d 467, 471 (5th Cir. 2005).

A.      Sufficiency of the Evidence For Count One of the Indictment

In determining whether the evidence is sufficient to support the convictions of Pugh and Borden on the conspiracy, the court views "the evidence and all inferences drawn from it in the light most favorable to the verdict to determine if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Burton,* 126 F.3d 666, 669 (5th Cir. 1997).  The focus is not on "whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins,* 506 U.S. 390 (1993).

The Indictment charges Pugh and Borden with conspiracy to commit kidnapping through the use of force, violence and intimidation.  (Ct. R., Doc. 23, p. 1.)  The Defendants concealed the nature, scope and objectives of the conspiracy and traveled in interstate commerce to achieve the ultimate goal of the conspiracy.  (*Id*.)  The Indictment alleges as overt acts in furtherance of the conspiracy that on October 8, 2008, Pugh and Borden used phone cord to bind McCoy's and Mogilles' hands.  (Ct. R., Doc. 23, p. 2.)  Pugh drove a Sequoia vehicle from Louisiana to

Mississippi and provided funds to another coconspirator for fuel. (*Id.*; Ct. R., Doc. 159, p. 50.) Pugh and Borden possessed a handgun which was fired that same day. (*Id.*)

Joseph Wolfert testified that he saw an individual in the passenger area of the sport utility vehicle [SUV] who's hands were bound with telephone cord. (Ct. R., Doc. 160, p. 17; Exh. G-10.) Elliot Jones testified that he saw a black male shooting at another black male running into the woods near Jones' home. (Doc 159, p. 61.) Mogilles testified that he owned a Toyota Sequoia SUV which he drove to Pugh's house the morning of October 8, 2008, to purchase some marijuana. (Ct. R., Doc. 161, pp. 111-15.) Mogilles had a long time friendship with Pugh, and saw Borden that day at Pugh's house whom he recognized as being the father of Pugh's sister's children. (*Id.*, p. 115.)

Mogilles testified that he was struck from behind in the head while sitting on the back porch rolling a cigarette at Pugh's house, and that he lost consciousness. (*Id.*, pp. 118-19.) He stated that shortly after that Pugh drug him into the house, and when he asked Pugh why he was being treated in that manner, Pugh stated that he believed that Mogilles had brought a police officer into his house. (*Id.*, p. 120.) Mogilles testified that Pugh was not the person that struck him. (*Id.*) McCoy and Mogilles each were bound by their hands on the floor in the den of the house. (*Id.*, pp. 121-23.) Then McCoy and Mogilles were dragged outside to Mogilles' SUV and placed in the SUV by Pugh. (*Id.*, pp. 124, 195.) Mogilles testified that he saw Whitmore, who he had met on an earlier occasion accompanying Pugh to the Mogilles family restaurant, standing at the door of the house, watching McCoy and Mogilles being loaded into the SUV. (*Id.*, pp. 108, 121-2, 124; G-18.) Mogilles saw a Toyota Scion parked in front of Pugh's house that day. (*Id.*, p. 125.)

Mogilles testified that Pugh was the driver of the SUV, that McCoy was seated behind the driver in the second seat, he was seated next to McCoy in the second seat, and Borden sat in the third seat behind McCoy, holding a pistol against McCoy's head. (*Id.*, pp. 124-5, 181, 184.) Both he and McCoy's hands remained bound during the trip from Louisiana to Mississippi. (*Id.*, p. 127.)

Mogilles stated that the vehicle stopped at a gas station in Mississippi, and he noticed the Scion at that station. (*Id.*, p. 128.) Mogilles also testified he saw Whitmore get out of the Scion at the gas station in Mississippi and that she spoke to Pugh at the gas station, although he was not aware of the contents of the conversation. (*Id.*, p. 200.) The vehicles reentered the interstate, traveling east, and shortly after the gas stop, Mogilles said that Pugh made a hand signal, which was followed by a loud pop, and when he looked at McCoy, blood was "pumping" out of his head. (*Id.*, pp. 129-130.)

Mogilles pulled out of his restraints, and jumped into the far rear seat, wrestling Borden for the gun. (*Id.*, p. 130.) Pugh stopped the vehicle, and opened the back hatch area. (*Id.*) Mogilles and Borden fell out of the SUV. (*Id.*) Mogilles was struck in the head, but managed to run off from the vehicle. (*Id.*) As he was running for the woods, shots were fired at him. (*Id.*, p. 131.) He was hit by at least one of the gun shots and fell. He claims he heard his assailants declare that he was dead, and shortly after that the vehicle pulled off. (*Id.*)

He tried to stop the bleeding and walked toward the road so he might not be found by his assailants. (*Id.*, pp. 131-2.) He stated that when he made it to the road, he saw the Scion driving slowly away from the area. (*Id.*, p. 132.) It appeared to Mogilles that the Scion's driver was looking for someone. (*Id.*, p. 133.) After the Scion passed by, he got out onto the road and

flagged down a school bus that was passing by. (*Id.*, pp. 133-4.) Mogilles exclaimed that he had

been shot and asked that someone call the police. (*Id.*, p. 134.) He was transported to the

hospital in an ambulance. (*Id.*) Mogilles testified that he remained in the hospital for seven

days, and lost about 26 centimeters of lower intestines and had bladder reconstruction as a result

of his injuries. (*Id.*, p. 135; G-31.)

Mogilles identified his SUV and the items he placed in the rear cargo area in a

photograph of the crime scene. (*Id.*, p. 137.) He could not identify a white container found in

that area, and testified that he did not place the gas can on the front passenger seat. (*Id.*, p. 138;

G-9.)

According to Pugh and Borden, the verdict as to all counts is not supported by the

evidence. Both Pugh and Borden were found guilty of conspiring to commit kidnapping, in

violation of Title 18, United States Code, Section 371, which makes it a crime for anyone to

conspire with someone else to commit an offense against the laws of the United States. (Ct. R.,

Doc. 136, p. 1.) For a defendant to be found guilty of such a conspiracy, the United States must

prove each of the following beyond a reasonable doubt: (1) that a defendant and at least one

other person made an agreement to commit the crime of kidnaping as charged in the Indictment;

(2) that the defendant knew the unlawful purpose of the agreement and joined in it willfully, with

the intent to further the unlawful purpose; and (3) that one of the conspirators during the

existence of the conspiracy knowingly committed at least one of the overt acts described in the

Indictment, in order to accomplish some object or purpose of the conspiracy.

It is not necessary for the United States to establish that the parties formally agreed to a

conspiratorial agreement, the agreement can be silent or tacit to support the idea that a conspiracy

existed.  *United States v. Martin*, 790 F.2d 1215, 1219-1220 (5th Cir. 1986), *cert. denied* 479 U.S. 868.  The evidence, viewed in the light most favorable to the United States, must be such as to permit the trier of fact to find, beyond a reasonable doubt, "that a conspiracy existed, that the accused knew it, and with that knowledge intentionally joined that conspiracy." *United States v. Bright*, 550 F.2d 240, 242 (5th Cir. 1977).  Slight evidence of the defendant's knowledge of the scheme may be sufficient to sustain the jury's finding that he or she was a member of the conspiracy.  *United States v. Evans*, 572 F.2d 455, 469 (5th Cir. 1978).

In this case, Mogilles testified that Whitmore watched as Pugh and Borden loaded McCoy and Mogilles into the SUV at Pugh's house.  Pugh drove the vehicle, and Borden held a gun to McCoy's head as the vehicle traveled into Mississippi.  Whitmore was driving the Scion and followed the SUV from Louisiana into Mississippi.  Each of these individuals were more than just bystanders to the incident at issue in this case, and voluntarily associated themselves in the kidnapping conspiracy.  *See United States v. Malatesta*, 583 F.2d 748, 756-7 (5th Cir. 1978).  As summarized above, the evidence establishes that Pugh and Borden each participated in the kidnapping.  The Court finds that the United States proved beyond a reasonable doubt the overt acts outlined in the Indictment. Mogilles' testimony alone is sufficient to sustain the conviction for this count against these defendants.  The Court further finds that the motions for judgment of acquittal or for new trial should be denied concerning Count One.

 B.  Sufficiency of Evidence for Count Two

Each of the defendants was found guilty of kidnapping and aiding and abetting the kidnapping of McCoy and Mogilles.  To find a defendant guilty of a violation of Title 18, United States Code, Section 1201(a)(1), the following facts must be proven beyond a reasonable doubt:

*First*:  That a defendant, knowingly acting contrary to law, kidnapped, seized, confined, or inveigled the person described in the Indictment, as charged;

*Second*:  That a defendant kidnapped the person for some purpose or benefit;

*Third:*  That a defendant willfully transported such person while so kidnapped, confined or inveigled; and

*Fourth*:  That the transportation was in interstate commerce.

There is no need for physical force or violence or even the threat of it to support this conviction.  *United States v. Ibarra-Zelaya*, 465 F.3d 596, 603 (5th Cir. 2006).  As indicated above, the United States has established that the transportation was in interstate commerce.  The Indictment alleged that these defendants transported McCoy and Mogilles in interstate commerce from New Orleans to Jackson County, Mississippi, for ransom or reward or otherwise and the kidnapping resulted in McCoy's death.  (Ct. R., Doc. 23, p. 2.)

To support an aiding and abetting conviction, the United States must prove that the three elements of the substantive offense, here, kidnapping, occurred and that each Defendant associated with the criminal venture, purposefully participated in the criminal activity, and sought by his/her actions to make the venture succeed.  *See United States v. Delagarza-Villarreal,* 141 F.3d 133, 140 (5th Cir. 1997); 18 U.S.C. § 2.  "Association" means that the defendant shared in the principal's criminal intent.  *United States v. Jaramillo,* 42 F.3d 920, 923 (5th Cir.1995).  "Participation" means that the defendant engaged in some affirmative conduct designed to aid the venture or to assist the perpetrator of the crime, so that, "to aid and abet, a defendant must share in the intent to commit the offense as well as play an active role in its commission."  *United States v. Lombardi,* 138 F.3d 559, 561 (5th Cir. 1998).

A defendant need not have participated in every phase of the criminal venture. *United States v. Hathaway*, 534 F.2d 386, 399 (1st Cir.), *cert. denied*, 429 U.S. 819 (1976). It is unnecessary that he/she have had knowledge of the particular means by which the principals in the crime would carry out the criminal activity. *United States v. Austin*, 585 F.2d 1271, 1277 (5th Cir. 1978). It is not enough to show that the defendant engaged in otherwise innocent activities that just happened to further the criminal enterprise. *United States v. Beckner,* 134 F.3d 714, 718-19 (5th Cir.1998). To establish that the defendant participated in the criminal activity, the United States must prove that the defendant "acted in some affirmative manner to aid the venture." *Akpan*, 407 F.3d at 371. Mere presence and association are insufficient to sustain a conviction for aiding and abetting, the United States must prove that the defendant took some affirmative action. *United States v. Alarcon*, 261 F.3d 416, 422 (5th Cir. 2001), *cert. denied* 534 U.S. 1099 (2002).

Whitmore claims that the evidence was insufficient to convict her of aiding and abetting kidnapping because she asserts that she took no affirmative action to facilitate the crime. (Ct. R., Doc. 140, p. 2.) She claims that, at best, the evidence shows she attempted to drive a getaway car. (*Id*.) She contends that the entire case against her centers around the premise that she followed the vehicle to a place where a crime was committed without proof that she knew a crime was taking place in the SUV. (*Id*., pp. 2-3.) Whitmore asserts that the evidence merely shows she was present during the crime, which is not sufficient to convict her as an aider and abettor. (*Id*., p. 2.)

In this case, Mogilles testified that he and McCoy went to Pugh's residence the morning of October 8, to find some marijuana to smoke. (Ct. R., Doc. 161, p. 112.) Mogilles

stated that he telephoned Pugh in advance, and when he arrived at Pugh's residence, Pugh seemed upset. (*Id.*, p. 114.) Mogilles said Pugh asked him why Mogilles had brought the police to Pugh's house. (*Id.*) Mogilles told Pugh that McCoy was a friend of his, not the police. (*Id.*) Pugh still seemed apprehensive, and when Mogilles asked about getting some marijuana from Pugh to smoke, Pugh told Mogilles he would have to wait, according to Mogilles' testimony. (*Id.*, p. 115.)

McCoy and Mogilles left Pugh's residence, went to a fast food restaurant to eat and then returned to Pugh's house. (*Id.*) When they got back to Pugh's home they went to the back patio to smoke, and while Mogilles was preparing a marijuana cigarette to smoke, he was struck in the back of the head and temporarily knocked unconscious. (*Id.*, pp. 118-19.) Next, Mogilles was dragged inside by Pugh, who repeatedly asked Mogilles why he brought a policeman into his house. (*Id.*, p. 119.) Mogilles stated that McCoy was already inside the house, lying on the ground unconscious. (*Id.*, p. 121.)

Contrary to Whitmore's claims, evidence produced at trial shows that she was aware that Borden and Pugh loaded McCoy and Mogilles into the SUV. (Ct. R., Doc. 161, pp. 108, 121-2, 124; G-18.) Tyrone Nelson, who was employed as a Jackson County Sheriff's deputy at the time of this incident, testified he was dispatched to the area to investigate a shooting incident. (Ct. R., Doc. 160, pp. 92-4.) Nelson testified that the dispatcher had advised of a Sequoia traveling down LaRue Road and another vehicle traveling with the Sequoia. (*Id.*, p. 94, 110.) Nelson observed and parked near the Sequoia, and was approached by a citizen who relayed that an oncoming vehicle had been traveling with the Sequoia as reported in the dispatch. (*Id.*, p. 95.) Nelson stopped the vehicle, a silver Scion driven by a black female. (*Id.*, pp. 96-97; Exh. G.-2.) Nelson

identified the Scion driver as Torenda Brooks (Whitmore), as identified on her driver's license. (*Id*., p. 117.) Whitmore told Nelson she was driving to Atlanta from New Orleans and got lost. (*Id*., pp. 97-8.) During the time Nelson was questioning her, other police officers discovered a body in the SUV. (*Id*., pp. 99-103.) Nelson was instructed to place Whitmore under arrest. (*Id*., pp. 103.)

Nelson, who patrolled that area on a regular basis, described the area on LaRue Road where the vehicles were parked as one of the first unpopulated places found north of the interstate. (*Id*., p. 107-8.) Based on this evidence and other evidence, the Court finds that the United States proved the elements of the crime of kidnapping and aiding and abetting the kidnapping of McCoy and Mogilles for each defendant.

C.    Felon in Possession of a Firearm

Defendants Borden and Pugh were each found guilty of felon in possession of a firearm in separate counts, in violation of Title 18, United States Code, Section 922(g)(1). (Ct. R., Doc. 136, p. 2.) For a defendant to be found guilty, the United States must prove all of the following elements beyond a reasonable doubt: (1) that the defendant knowingly possessed a firearm, as charged; (2) that before possessing a firearm, the defendant had been convicted in a court of a crime punishable by imprisonment for a term in excess of one year, that is, a felony offense; (3) that the possession of the firearm was in or affecting interstate commerce.

In order for a defendant to be found guilty of this crime the United States must prove beyond a reasonable doubt that the defendant knowingly possessed the firearm; that before possessing the firearm the defendant had been convicted in a court of a crime punishable by imprisonment for a term in excess of one year, that is, a felony offense; and that

the possession of the firearm was in or affecting commerce; that is, it had traveled at some time from one state to another. Both Borden and Pugh stipulated that they each had been convicted of a prior felony. (Ct. R., Doc. 159, pp. 39-40.)

Mogilles testified that he saw Borden hold a gun to the back of McCoy's head from the time the Sequoia left Louisiana and traveled into Mississippi. (Ct. R., Doc. 161, pp. 126-128.) The Safe Streets Task Force to which Lorrain is assigned includes Jackson County, Mississippi, in its jurisdiction. Lorrain testified that he interviewed Whitmore after the October 8 incident. (Ct. R., Doc. 161, p. 225.) Whitmore followed the Sequoia containing Borden, McCoy, Mogilles and Pugh from Louisiana to Mississippi, stopping for gas along the way. (*Id*., pp. 228-9.) Lorrain interviewed Pugh, and Pugh stated he picked up the gun when it fell from the car following the struggle between Mogilles and Borden at the back of the Sequoia while out on LaRue Road. (Ct. R., Doc. 162, p. 14.) He also stated he fired the gun at Mogilles as Mogilles ran from the vehicle into the woods. (*Id*., p. 15.) This evidence is sufficient to support the conviction for both Borden and Pugh in relation to this crime.

D.      Possession of a Firearm in Connection with a Crime of Violence

Defendants Pugh and Borden were also found guilty of possession of a firearm in connection with a crime of violence, in violation of Title 18, United States Code, Section 924(c)(1). (*Id*., pp. 2-3) For a defendant to be found guilty of this crime, the United States must prove each of the following elements beyond a reasonable doubt: (1) that the defendant committed the crime alleged in either Count 1, 2, or 3; and (2) that the defendant knowingly used or carried a firearm during and in relation to the defendant's commission of the crime charged in Count 1, 2, or 3. As discussed above, Borden and Pugh were found guilty of the crimes charged

in counts 1, 2 and 3 of the Indictment.  (Ct. R., Doc. 136, pp. 1-2.)  In addition, Borden and Pugh were convicted of possession of a firearm in association with the crimes charged in counts 1, 2 and 3 of the Indictment.  (*Id.*, p. 2.)

        "Crime of violence" includes murder, manslaughter, kidnaping, aggravated assault, forcible sex offenses, robbery, arson, extortion, extortionate extension of credit, and burglary of a dwelling.  *United States v. Ellis*, 564 F.3d 370, 371 (5th Cir. 2009).  To be guilty of using a firearm during the commission of a violent crime under 18 U.S.C. §§ 924(c)(1), the United States must prove only that the firearm was available to the defendant to facilitate the crime of violence.  *United States v. Osborne*, 68 F.3d 94, 100 (5th Cir. 1995).  Here, Mogilles testified that Borden held a gun to McCoy during the trip from Louisiana to Mississippi; and that the gun fell from Borden's hands during their struggle after Mogilles jumped into the rear of the SUV and Pugh opened the cargo door.  He also testified that he was afraid to attempt escape during the trip because of the gun.  Jones testified he saw two black males in possession of a firearm shooting at an individual running away in the middle of LaRue Road on the date at issue in this case.  The Court has outlined some of the supporting evidence in this case which is sufficient to establish beyond a reasonable doubt that Borden and Pugh are guilty of possession of a firearm in connection with a crime of violence.

II.     Expert Testimony of Brandon Giroux, Machelle Reid and Maureen Bradley

        Pugh asserted that testimony from Giroux, Reid and Bradley should be excluded because, "comparisons processes . . . have unreliable methods of peer review, and lack proper data regarding their rates of error." (Ct. R., Doc. 113, pp. 1-2.)  Pugh sought to exclude the expert witness testimony of Giroux regarding bullets he examined; Bradley, who testified regarding

paint chips recovered from a vehicle; and Reid who testified concerning comparisons of cast footwear impressions and Pugh's shoe. (Ct. R., Doc. 114, pp. 1-3.) Pugh asserts that none of these experts should be allowed to testify in this case because their methods do not meet the standards set forth in *Daubert v. Merrill Dow Pharmaceuticals*.[2] (*Id.*, p. 3.) The Court conducted *Daubert* hearings for each of the three expert witnesses, to determine that each was qualified as an expert in his or her particular field.

Federal Rule of Evidence 702 provides as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The proponent of the expert must prove by a preponderance of the evidence that the expert's testimony is reliable. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (*en banc*), *cert. denied* 526 U.S. 1064 (1999).

In arguing that Giroux's testimony should be excluded, Pugh argued that toolmark identification should not be considered a reliable field of expertise under Federal Rule of Evidence 702 and *Daubert*, because of the unreliable nature of identification process, and the possibility of a false match between a gun and ammunition. (*Id.*, p. 7.) Pugh contends that there is no reliable statistical or scientific methodology which would permit an expert to testify that a match is certain or scientifically certain. (*Id.*, p. 11.) Pugh asks that the Court "re-examine the current carte blanche state of accepting toolmark identification as an admissible field of expertise." (*Id.*, p. 16.) Whether a *Daubert* challenge is properly made to an expert's testimony

---

[2]509 U.S. 579 (1993).

requires a fact specific inquiry into the proffered testimony after consideration of the issue at hand, the witness' expertise, and the subject of the testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-8 (1999); *see Black v. Food Lion, Inc.*, 171 F.3d 308, 311 (5th Cir. 1999).

Factors which the Court might use to determine whether to admit an expert's testimony include the following:

> (1) Whether a "theory or technique . . . can be (and has been) tested";
> (2) Whether it "has been subjected to peer review and publication;
> (3) Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and
> (4) Whether the theory or technique enjoys "general acceptance" within a "relevant scientific community"

*Kumho Tire*, 526 U.S. at 149.

District courts are given "wide latitude in determining the admissibility of expert testimony." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997). The Court must bear in mind that "the heart of *Daubert* is relevance and reliability. As long as some reasonable indication of qualifications is adduced, the court may admit the evidence without abdicating its gate-keeping function. After that, qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity." *Rushing v. Kansas City S. R.R.*, 185 F.3d 496, 507 (5th Cir. 1999).

A.    Giroux's Testimony

Matching spent shell casings to the weapon that fired them is a recognized method of ballistics testing. *See United States v. Washington*, 550 F.2d 320, 324 (5th Cir. 1977). Other than the argument raised by magazine articles cited by the defense and an out-of-state federal district court ruling, the Court has not found a case from the Fifth Circuit which shows that

Giroux's findings are unreliable.  On the contrary, firearm comparison testing has widespread acceptance in this Circuit.  *United States v. Hicks*, 389 F.3d 514, 527-8 (5th Cir. 2004), *cert. denied* 546 U.S. 1089 (2006).  The Court finds no reason to grant the motion for new trial based on Giroux's testimony.

      B.      Reid's Testimony

Footprint analysis is not a new concept and expert testimony on footwear comparisons has been admitted in courts in the United States.  *United States v. Rodgers,* 85 Fed. Appx. 483, 486-7 (6th Cir. 2004), *cert. denied,* 541 U.S. 1055; *United States v. Ross,* 263 F.3d 844, 846-7 (8th Cir. 2001); *United States v. Allen,* 207 F. Supp.2d 856, 866 (N.D. Ind. 2002).  Reid established that the theory and technique of footwear comparisons have been tested; that the techniques for shoe-print identification are generally accepted in the forensic community, and that the science of footwear analysis has by now been generally accepted.  *Daubert,* 509 U.S. at 593-94.  The Court found that the expert shoe print testimony was based on specialized knowledge and would aid the jury in making comparisons between the soles of shoes found on or with the Defendant and the imprints of soles found on surfaces at the crime scene.  The Court finds no reason to grant a new trial based on the *Daubert* challenge to Reid's testimony.  *See United States v. Norris*, 217 F.3d 262, 271 (5th Cir. 2000).

      C.      Bradley's Testimony

Finally, chemical analysis of paint chips and matching of chips to a certain paint batch falls under Federal Rule of Evidence 702.  The rule provides that a witness qualified as an expert may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and

(3) the witness has applied the principles and methods reliably to the facts of the case. Bradley testified that she worked in the chemistry unit of the FBI for over ten years. (Ct. R., Doc. 160, p. 46.) She has a bachelor of Arts degree in chemistry, a masters of science and PhD., in analytical chemistry. (*Id*.) The Court first finds that Bradley's academic background in chemistry, and her experience in forensic chemistry qualifies her as an expert in this field. *Watkins*, 121 F.3d at 991.

The Standard Guide for Forensic Paint Analysis and Comparison of the American Society for Testing and Materials [ASTM], which Bradley relied on in her testing, is widely accepted by engineers and other professionals in the field of materials testing. *See Eclipse Elec. v. Chubb Corp.,* 176 F. Supp.2d 406, 410 (E.D. Pa.2001); *United States v. Vitek Supply Corp.,* 144 F.3d 476, 485 (7th Cir.1998). Bradley's testimony is sufficiently reliable and relevant and may assist the trier of fact in understanding the evidence or determining a fact in issue, as required by Rule 702. All of Bradley's proposed testimony relates to the facts at issue in the case regarding the matching of paint chips found in an area off LaRue Road and connecting those paint chips to the SUV containing McCoy's body. The Court finds that Bradley qualifies to render expert testimony in the area of forensic chemistry. *See Seatrax, Inc. v. Sonbeck Intern., Inc*., 200 F.3d 358, 372 (5th Cir. 2000). The Court further finds no reason to grant a motion for new trial based on the Defendants' *Daubert* challenge to this expert.

III.   Pugh's Alleged Denial of his Sixth Amendment rights

Pugh asserts that his Sixth Amendment right was denied because the jury heard evidence regarding statements by Whitmore that necessarily implicated Pugh. (Ct. R., Doc. 147, p. 2.) Pugh claims he was unable to cross examine Whitmore, because she exercised her right to remain silent. Pugh alleges that the counsel for co-defendants Whitmore and Borden made a

number of comments and arguments throughout the trial that were unduly prejudicial to Pugh. (*Id.*)

The general rule is that persons indicted together should be tried together. *United States v. Kane,* 887 F.2d 568, 571 (5th Cir.1989), *cert. denied,* 493 U.S. 1090 (1990). "Mutually antagonistic defenses are not prejudicial *per se,*" so as to mandate severance. *See United States v. Rocha,* 916 F.2d 219, 231 (5th Cir. 1990); *see also Zafiro v. United States,* 506 U.S. 534, 538 (1993). Co-defendants are entitled to severance when they demonstrate antagonistic defenses. *United States v. Hernandez,* 842 F.2d 82, 86 (5th Cir.1988). The test for antagonistic defenses requires that the defenses be irreconcilable or mutually exclusive so that in order to believe one defendant's defense, the jury must necessarily disbelieve the antagonistic defense of another defendant. *Hernandez,* 842 F.2d at 86. In other words, the core of one defendant's defense must be contradicted by a co-defendant's defense. *United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir. 1981).

The Defendants' defenses in this case are not mutually exclusive, as required by the test, as it would be possible for a jury to believe that Borden or Pugh or Whitmore were involved in a conspiracy (with each other and/or another person), while also believing that either Borden, Pugh or Whitmore was a member. *See United States v. Bruno,* 809 F.2d 1097, 1103 (5th Cir. 1987), *cert. denied* 481 U.S. 1057. In this case, for example, Whitmore's defense for being on LaRue Road the day McCoy's body was found was that she was on a trip and got lost. This defense does not implicate either Borden or Pugh. In addition, the Court instructed the jury about considering evidence separately against each Defendant, and this was sufficient to provide adequate protection against compelling prejudice. *United States v. Solis*, 299 F.3d 420, 442 (5th

Cir. 2002).  The Court finds no reason to overturn the jury verdict in this case based on this argument.

IV.     Pugh's Medical Treatment

        According to Pugh, he refused to consent to medical treatment and was taken to the hospital for purely investigative purposes against his will.  This contention was discussed in the Court's order on Pugh's motion to suppress this evidence prior to trial.  (Ct. R., Docs. 108, 129.) There is no reason to grant a new trial based on this argument regarding Pugh's medical treatment.

V.      Errors in Sustaining and Overruling Objections or Motions

        Borden and Whitmore maintain that the Court erred in not sustaining any and all motions or objections filed by the Defendants and further erred in sustaining any motions or objections filed by the United States. Without referring to a specific objection made during the trial, it would be almost impossible to determine if the Court made an error in its rulings.  A contention that the Court erred in not sustaining the Defendants' motions and in sustaining the United States' motions should specify the motion in dispute.  All motions that were submitted prior to trial, in written form, were thoroughly reviewed by the Court.  In short, without specifying the error, it is impossible for the Court to adequately consider an error, if any, in the rulings made during the trial of this matter.  The Court further finds no reason to overturn the jury verdict based on these bald assertions.

VI.     Introduction of Prejudicial Photographs

        Borden and Whitmore contend that numerous autopsy pictures, pictures of the victim, McCoy, and pictures of the Toyota Sequoia which were allowed to be introduced and offered

into evidence at trial were inflammatory and prejudicial and had no probative value. "Admitting gruesome photographs of the victim's body in a murder case ordinarily does not give rise to an abuse of discretion where those photos have nontrivial probative value." *Unites States v. Fields*, 483 F.3d 313, 355 (5th Cir. 2007). Many of the photos had different relevance from other photos, and some of the photos clearly supported points distinct from points made by others. The Court carefully considered the issue of the introduction of the photos during the trial of this case. The Court finds no reason to overturn the jury verdict because of photographs introduced during the trial of this matter.

VII     Inflammatory Remarks

Borden and Whitmore assert that clear error was committed at trial when the United States' attorneys attempted to inflame the jury to raise sympathy for the deceased victim or his family. They assert that the United States' attorneys repeatedly referred to the victim's mother in the courtroom which is inappropriate, illegal, inflammatory and prejudicial arguing only to inflame the jury to reach an inappropriate finding.

For prosecutorial remarks to be considered prejudicial, they must render the trial unfair, evincing either persistent misconduct or, if the evidence is so slight, the conviction probably would not have occurred but for the remarks. *Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002). In this case, the United States only referenced the victim's mother in its opening and closing statement. The Court instructed the jury that opening and closing statements are not evidence and should not be considered as such during the jury's deliberations. The Court is entitled to presume that the jury will follow specific instructions. *United States v. Thompson*, 482 F.3d 781, 788 (5th Cir. 2007). In addition, "[a] criminal conviction is not to be lightly

overturned on the basis of a prosecutor's comments standing alone." *Lowenberg,* 853 F.2d at

302.  A defendant is entitled to reversal only if he shows that the prosecutor's statements affected

his substantial rights by casting serious doubt on the jury's verdict. *Lowenberg,* 853 F.2d at 302.

The Court finds that any reference by the prosecutor to a family member present at the trial did

not affect any Defendant's substantial rights and further finds no reason to overturn the jury's

verdict based on this contention.    *United States v. Rocha*, 916 F.2d 219, 234-5 (5th Cir. 1990).

VIII.    <u>Confrontation Clause Violation in Use of 911 Tape</u>

Whitmore maintains that the Court erred in allowing the United States' Exhibit G-5 into

evidence, which was a 911 call that was allegedly nothing more than double hearsay, there was

no exception to the hearsay rule given to the Court at trial, and that it violated Whitmore's Sixth

Amendment right to confront the declarant.  (Ct. R., Doc. 140, p. 3; Doc. 160, p. 279, Exh. G-5.)

A tape-recording of a 911 call is nontestimonial, and it does not implicate the right to

confrontation.  *United States v. Proctor*, 505 F.3d 366, 372 (5th Cir. 2007).  The Court therefore

finds no reason to grant a new trial based on this contention.

IX.    <u>Suppression of Illegally Obtained Statements and Violation of *Miranda v. Arizona*</u>

In support of the argument regarding a violation of *Miranda*, Pugh contends that he was

arrested on October 8, 2008, without probable cause to believe that he committed a crime.  He

claims that federal agents obtained invalid waivers which Pugh executed without a full

understanding of his right to a court appointed attorney.  Third, Pugh alleges that threats and

promises were made to him prior to the time he spoke with federal agents on October 10, 2008,

thus rendering any statements he made involuntary.  Finally, Pugh maintains that federal agents

had full control of the investigation on or around the morning of October 10, 2008, and instead of

bringing Pugh before a federal magistrate where he would have been appointed an attorney, he was instead questioned about his involvement with the incident. Pugh was brought before a federal magistrate several days later, after speaking with federal agents on three separate occasions. Pugh asserts these actions violate Title 18, United States Code, Section 3501, and Rule 5(a) of the Federal Rules of Criminal Procedure. (*Id.*, pp. 1-2.)

A.    Torenda Whitmore

Whitmore contends she was seized by Jackson County deputies and taken to the sheriff's department where she was told she was going to get the death penalty is she did not cooperate with law enforcement. (Ct. R., Doc. 49, Exh. A., p. 1.) She further asserts that she was told she would be allowed to go home if she gave a statement, and was not told she was under arrest. (*Id.*) She claims in her affidavit that her rights were not explained to her and the only reason she gave statements to the officers was because she understood that she would be allowed to leave after she made those statements. (*Id.*, p. 2.)

Whitmore claims that she was never arrested or charged with a crime when she was taken out of her car at gunpoint on October 8, 2008. (Ct. R., Doc. 94, p. 1.) She contends that there was no evidence that she had committed a crime and there were no reasonable grounds to conclude that she had committed a crime in connection with these events. (*Id.*) Accordingly, Whitmore claims the sheriff's department did not have probable cause to arrest her. (*Id.*, p. 4; Exh. D-6.) She claims that her statement made at 5:24 P.M., on October 8, 2008, was the fruit of the poisonous tree due to her illegal arrest, and contends that the statements should be suppressed. (*Id.*, p. 5.)

One witness' statement provides that a tan sport utility vehicle [SUV] was stopped on LaRue Road in Latimer, Mississippi, on October 8, 2008, with a silver car about 30 feet behind it. (Ct. R., Exh. G-4.) Both vehicles were facing northeast. (*Id*.) Three black males were standing behind the SUV, when suddenly one of them ran into the woods. (*Id*.) The other two men chased the first man, firing at least two or three shots at the man. (*Id*.) The witness backed up the road and immediately called 911 upon arriving back at the witness' house. (*Id*.)

Another witness traveling down LaRue Road saw a SUV parked in the road, with a silver car parked about 20 feet behind the SUV. (Exh. G-S.) The witness also saw three black men standing behind the car, then one of the men started running towards the woods. (*Id*.) The other two men followed in pursuit, and one of the men shot at the man who was running. (*Id*.) While the witness was calling the Jackson County Sheriff's office, the silver car which was observed behind the SUV was turning into the witness' driveway. (*Id*.) The car backed out and went back down LaRue Road. (*Id*.) Another witness observed Rahman Mogilles in a ditch with gunshot wounds to his back and buttocks. (Ct. R., Doc. 1, p. 3.)

When she was interviewed, Whitmore told investigators that Pugh was her boyfriend, and that they lived together at Pugh's mother's house in New Orleans. (Ct. R., Doc. 96, pp. 10, 12.) Mogilles came to the house where she and Pugh were living and there was a confrontation between Pugh and Mogilles about something. (*Id*., p. 12.) Shortly after the confrontation, Pugh asked Whitmore to follow him in the Scion. (*Id*., p. 13.) She allegedly witnessed the scuffle on LaRue Road between Pugh, Borden and Mogilles just before Mogilles bolted towards the woods. (*Id*., p. 14.)

Whitmore contends that the statements made by her to police officers in the course of investigating the incident at issue should be suppressed for several reasons. First, she claims she was not Mirandized, although evidence to the contrary was presented to the Court. Second, she claims that she asked for an attorney to be present during questioning, and this request was denied. Video shows otherwise. Third, she claims that because she was illegally arrested by the Jackson County Sheriff's department at the scene of the alleged crime, her subsequent statements to the officers should be suppressed.

Lieutenant Ken McClenic testified that he responded to a possible crime scene on October 8, 2008, in the LaRue Road area. (Ct. R., Doc. 104, p. 5.) He found a vehicle which was burned with a body inside of it, and another vehicle parked out in the road which was occupied by Whitmore. (*Id*., p. 6.) A witness had seen her vehicle following the vehicle which contained the body. (*Id*., p. 7.) She told McClenic she was lost and trying to find her way back to the interstate. (*Id*.) During the conversation, other deputies found a victim with gunshot wounds near the woods near by. (*Id*.)

McClenic testified that he explained the *Miranda* rights to Whitmore prior to questioning her at the Jackson County Sheriff's Department substation on Highway 609 in St. Martin, Mississippi. (*Id*., pp. 10-11, 14.) McClenic identified the exhibit marked as D-1 as a copy of the version of the events which happened that day which Whitmore wrote for him during the questioning. (*Id*., p. 13.) The custody form, signed by McClenic, provides that Whitmore was arrested on LaRue Road at 15:42. (Exh. D-6.)

McClenic stated he did not tell Whitmore she would be able to go home after giving her statement. (*Id*.) He testified that she did not ask to consult with an attorney. (Ct. R., Doc. 104,

p. 13.)  McClenic stated that Whitmore was not being charged with a crime at the time of her

questioning.  (*Id.*, p. 19.)  He testified that Whitmore was sitting in her car about 25 feet from a

vehicle which had been burned and contained a dead body.  (*Id.*, p. 30.)

Whitmore asserted in her motion to suppress that she was arrested and not totally advised

of the reason for the arrest.  (Ct. R., Doc 49, p. 1.)  She claimed in that motion that she was

promised she would be released immediately if she cooperated and that the promises amounted

to coercion making her statements were involuntary.  (*Id.*, p. 2.)  Whitmore further claimed she

could not knowingly and intelligently waive her *Miranda* rights because it was the first time she

was ever arrested and she was unfamiliar with the criminal justice process.  (*Id.*)

According to the United States, a written waiver shows that Whitmore voluntarily waived

her *Miranda* rights.  (Ct. R., Doc. 83, p. 5.)  In addition, there is a video and audio recording of

the interview which establishes that Whitmore received her *Miranda* rights and voluntarily

waived those rights.  (*Id.*)  Whitmore stated on a video of the interview that she was not promised

anything in return for her statements.  (Ct. R., Doc. 84.)  She did not invoke her right to counsel

in the video.  (*Id.*)

Lorrain testified that he administered *Miranda* warnings to Whitmore at the Jackson

County substation on October 8, 2008.  (Ct. R., Doc. 96, pp. 8-9.)  Lorrain provided that

Whitmore indicated she understood her rights and agreed to answer questions without the

presence of attorney.  (Ct. R., Exh. G-1.)  She also signed the waiver form at 5:24 P.M., and

indicated that she understood her rights.  (*Id.*; Ct. R., Doc. 96, p. 10.)

An arrest made without a warrant is permissible provided the officers had probable cause

to suspect the person that is arrested in involved in criminal activity.  *United States v. Costner*,

646 F.2d 234, 236 (5th Cir. 1981). The Court finds that the tips provided by witnesses, including a statement that the Scion Whitmore was driving was seen following the SUV which was found partially burnt with a dead body inside, along with the descriptions of the crime scene given by 911 callers provided sufficient probable cause to allow for the arrest and detention of Whitmore. *United States v. Sokolow*, 490 U.S. 1, 9 (1989); *United States v. Holloway*, 962 F.2d 451, 459-60 (5th Cir. 1992). The Court finds no reason to suppress Whitmore's statements because of her arrest on LaRue Road.

Whitmore was arrested on the scene, according to police records. (Exh. D-6.) The Court must determine whether the Fourth and Fourteenth Amendments to the United States Constitution were violated when Whitmore was taken into custody. The seizure of a person must be supported by probable cause in order to comport with Fourth Amendment protections. *Dunaway v. New York*, 442 U.S. 200, 215-16 (1979); *United States v. Shugart,* 117 F.3d 838, 846 (5th Cir. 1997). "Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *United States v. Ramirez,* 145 F.3d 345, 352 (5th Cir.1998).

In this case, on October 8, 2008, police officers responded to a 911 call which identified shots fired at a fleeing man by two males, a silver car following an SUV, which was burnt and found to contain a body, an individual who had been shot twice who was found nearby, and Whitmore, in a silver car not far from the location of these events. (Ct. R., Exhs. G3 and G4; Doc. 96, pp. 6, 162, 182-3.) The combination of these facts was sufficient to give the officers probable cause to believe Whitmore was connected to the shooting of one individual and death of

another person found in the SUV.  *See Harper v. Harris County, Texas,* 21 F.3d 597, 601 (5th Cir. 1994).  The Court finds that the officers had probable cause to arrest Whitmore for these offenses, and that her post-arrest statements resulted from a lawful, rather than unlawful, arrest. *United States v. McCowan*, 469 F.3d 386, 390 (5th Cir. 2006).

Whitmore also contends that she invoked her Fifth Amendment right to counsel.  The Court finds no evidence that Whitmore sought representation of counsel during the interrogation on October 8.  All evidence supports the finding that *Miranda* rights were read to Whitmore by McClenic and Lorrain, and that Whitmore waived her rights and voluntarily offered statements. (Ct. R., Exh. G-1; Docs. 83, Exh. A and 83-3.)  In addition, the Court finds that she did not invoke her right to counsel at any time.

If she had invoked her Sixth Amendment right to counsel, she was guaranteed under that Amendment "at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between [she] and the State."  *Maine v. Moulton*, 474 U.S. 159, 176 (1985).  This right was not triggered until " a prosecution is commenced."  *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991).  No prosecution was started at the time she was questioned, and the Court finds no reason to suppress her statements based on her arguments to the contrary.

In his motion to suppress statements, Pugh contended he was not effectively advised of his right to have an attorney.  (Ct. R., Doc. 63, p. 11.)  He claims that he was told that he was facing a capital murder charge which could result in the death penalty.  (*Id*., p. 14.)  He further contended that he was told that the only was to avoid the death penalty was to provide a statement so that the case could be charged in federal, rather than state court.  (*Id*.)  As a result, he claims that his resulting statement was not voluntary.  (*Id*.)

Pugh also asserted that his statements made on October 10, 2008, were not the result of an intelligent or voluntary waiver. (*Id.*, pp. 14-15.) He claimed he was deprived of needed medication and that he was kept in isolation while at the Jackson County Adult Detention Center [JCADC]. (*Id.*, p. 14.) Pugh claimed that Lorrain advised him that his mother, Sheila Stallworth, indicated that she wanted Pugh to cooperate and to speak with Lorrain. (*Id.*, p. 15.) Pugh contended that his statements were not voluntary and were a product of coercion. (*Id.*)

Pugh stated that he was arrested at 4:00 P.M., on October 8, 2008, and transported to the JCADC. (Ct. R., Doc. 63, p. 5.) He claimed he was badgered by Jackson County officers and threatened. (*Id.*, pp. 5-9.) Pugh further claimed he was taken for an examination by a physician because of injuries, but was not given his necessary prescription medication. (*Id.*, p. 9.) He contends that he was cold, because he had been left in wet clothing and later allegedly was left naked in his cell, and these conditions were part of the coercion he endured. (*Id.*, p. 6.)

Pugh asserted that he was told by Jackson County officials that he would not be able to obtain an attorney unless he hired one himself. (*Id.*, p. 11.) He claimed he kept telling the officers that he did not understand his rights as they were read to him, but those rights were never clarified. (*Id.*) Pugh alleged that because he was advised that the only way he could avoid a possible death penalty based on a state capital murder charge was to cooperate and provide a statement to the federal authorities, he was coerced into making statements to law enforcement officials. (*Id.*, p. 14.) He contended that Lorrain coerced him into making a statement by mentioning that Pugh would be taken out of isolation, would have the specter of the death penalty removed from his future, and would be allowed to speak with his mother. (*Id.*, p. 15.)

Pugh claimed that these reasons established that his decision to sign a waiver of rights form was not voluntary. (*Id.*)

Lorrain administered the *Miranda* warnings at the time Pugh was interviewed on October 10, 2008. (Ct. R., Doc. 76, p. 14.) This second waiver validates the statements made by Pugh to Lorrain, according to the United States. (*Id.*, p. 16.) The United States argues that Pugh never invoked his right to counsel, but rather he agreed to answer questions without the presence of an attorney. (*Id.*, p. 17, Exhs. C, D, & E.) Questions about how to obtain an attorney and even whether an attorney should be present are not considered to be an assertion of the right to an attorney, according to the United States. (*Id.*, p. 18.)

A defendant must be apprised of the constitutional right against self-incrimination and validly waive this right in order for statements made by that defendant while in police custody to be admissible. *Miranda*, 384 U.S. at 478-9; *United States v. Braithwaite*, 458 F.3d 376, 382 (5th Cir. 2006). The defendant must show that he was in custody while being interrogated. *United States v. Wells*, 755 F.2d 382, 390 (5th Cir. 1985). There is no doubt that Pugh was in custody at the time of the questioning. (Ct. R., Doc. 89-2.) After the defendant shows that he was in custody, the United States must show that the defendant knowingly, voluntarily and intelligently waived his Fifth Amendment rights. *North Carolina v. Butler*, 441 U.S. 369 (1979).

In this case, the United States submitted a waiver of rights form which was signed by Pugh at 10:51 P.M., at the Jackson County substation on October 8, 2008. (Ct. R., Doc. 76-2.) In addition, Lorrain testified that he read Pugh his rights on October 10, 2008. (Ct. R., Doc. 96, p. 92.) A signed waiver of rights form dated October 10, 2008, was provided by the United States. (Ct. R., Doc. 76-3.) A third signed waiver of rights dated October 11, 2008, is included and

provides that it was completed at Old Biloxi Road and LaRue Road. (Ct. R., Doc. 76-4.) Lorrain

testified that he did discuss certain scenarios with Pugh concerning possible state charges;

arrangements for Pugh and Whitmore to visit; and statements made by Pugh's mother, Sheila

Stallworth, concerning Pugh's level of cooperation with the authorities. (*Id*., pp. 99-103.) These

types of things do not amount to coercion making Pugh's statements involuntary. *United States

v. Bell*, 367 F.3d 452, 461-2 (5th Cir. 2004).

In determining whether a person who received a *Miranda* warning has validly waived

these rights, the court should consider the following:

> First, the relinquishment of the right must have been voluntary in the sense that it
> was the product of a free and deliberate choice rather than intimidation, coercion,
> or deception. Second, the waiver must have been made with full awareness both
> of the nature of the right being abandoned and the consequences of the decision to
> abandon it. Only it the "totality of the circumstances surrounding the
> investigation" reveal both an uncoerced choice and the requisite level of
> comprehension may a court properly conclude that the *Miranda* rights were
> waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).

The Court may consider the background, experience and conduct of the accused in

determining if the waiver was knowing and intelligent. The Court concludes that Pugh

voluntarily and intelligently waived his rights. He had received *Miranda* warnings several times

before speaking to law enforcement officials. (Ct. R., Docs. 76-2, 76-3, 76-4.) Pugh signed a

waiver of rights each time those warnings were given. (*Id*.) Lorrain's testimony was that Pugh

was not offered any promises and that he did not coerce Pugh into waiving his rights, which the

Court finds to be credible evidence. *Colorado v. Spring*, 479 U.S. 564, 576. (1987); *United

States v. Cardenas*, 410 F.3d 287, 292-3 (5th Cir. 2005). In addition, Pugh had extensive

experience with law enforcement[3] and nothing in the record indicates that he lacked average intelligence or education. *United States v. Hearn*, 2009 WL 607350, 6 (5th Cir. 2009). The Court, therefore, concludes that Pugh voluntarily waived his rights in making the statements to the officials.

Pugh also asserted that his statements should have been suppressed because of the delay between the time of his arrest and his appearance before a magistrate judge. (Ct. R., Doc. 97, p. 1.) He claimed that the FBI was deeply involved in the investigation of this case as evidenced by the man hours spent by federal agents investigating and interviewing suspects in this case. (*Id.*, p. 3.) Lorrain directed the search at Stallworth's New Orleans home. (*Id.*) Through the information obtained from Pugh and his mother, the officers were able to obtain confessions and discover evidence that the initial investigation did not garner. (*Id.*) Pugh asserted that the state and federal agents worked in conjunction with each other in this investigation, and that the level of federal involvement shows a collusive relationship between federal and state agents which triggers the need to bring the defendant before a federal magistrate within six hours of his arrest. (*Id.*, pp. 1-4.)

18 U.S.C. § 3501 governs the admissibility of confessions in federal prosecutions. Under 18 U.S.C. § 3501(c), a custodial confession made by a person within six hours following his arrest is not admissible because of delay in bringing the person before a federal magistrate, on federal charges. *United States v. Alvarez-Sanchez*, 511 U.S. 350, 351-2 (1994). In other words, a duty to present a person to a federal magistrate does not arise until the person has been arrested for a *federal* offense. *See* FED. RULE CRIM. P. 5(a) (requiring initial appearance before a federal

---

[3]Ct. R., Doc. 96, pp. 45-6.

magistrate).  Until a person is arrested or detained for a federal crime, there is no duty, obligation, or reason to bring him before a judicial officer "empowered to commit persons charged with offenses against the laws of the United States," and therefore, no "delay" under section 3501(c) can occur.  *United States v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994); *see also United States v. Romano*, 482 F.2d 1183 (5th Cir. 1973) .

At the time of Pugh's statements, he was in custody on state charges.  The federal complaint and warrant were not issued in this case until October 14, 2008.  (Ct. R., Docs. 1-4.) Until that time, Pugh was in custody solely on state charges.  *See United States v. Watson*, 591 F.2d 1058, 1062 (5th Cir. 1979) (holding that section 3501(c) did not apply until a defendant who was being held in custody by state officials on a state charge of bank robbery was taken into federal custody even though a federal warrant had issued based on the same offense prior to the defendant's arrest by state officials).

In this case, there simply is no evidence that Pugh was held by state authorities merely to allow the federal agents to question him without complying with federal statutes.  *See Alvarez-Sanchez*, 511 U.S. at 360.  The record reveals no such improper collaboration in this case, as Pugh has not established that he was held in state custody merely to allow federal agents to question him without complying with either Federal Rule of Criminal Procedure Rule 5 or 18 U.S.C. § 3501(c).  The only evidence before the Court is that of nothing more than "routine cooperation between local and federal authorities," which is "wholly unobjectionable."  *Alvarez-Sanchez*, 511 U.S. at 360.

The statements and evidence applicable to this case were made by Pugh well beyond six hours following his arrest on state charges, as Pugh seeks to suppress statements made on October 10, 2008, and physical evidence found on October 11, 2008. (Ct. R., Doc. 97, p. 3.) The Defendants were arrested on federal charges on October 14, 2008, and later brought before the federal magistrate. (Ct. R.) The Court finds that section 3501(c) does not apply in this case, since the defendants were not charged with a federal crime until the arrest. In addition, the Court finds that any delay between the arrest and appearance before the federal magistrate was reasonable, since the delay was not a result of any action on the part of the federal authorities. (Ct. R., Docs. 16-18.) The Court, therefore, concludes that any statements and evidence presented by a defendant should not be suppressed based on an alleged delay in presenting that defendant to the federal magistrate in this case. *See United States v. Hall*, 152 F.3d 381, 425-6 (5th Cir. 1998).

Pugh also asserts that certain physical evidence should be suppressed. (Ct. R., Doc. 67.) Following Whitmore's interview, Lorrain called the Safe Streets Task Force in New Orleans to advise them that the crime being investigated in Mississippi had initiated in New Orleans. (Ct. R., Doc. 96, p. 17.) Lorrain requested that Pugh's mother's house be placed under surveillance until a search warrant for the residence could be obtained. (*Id.*) On the evening of October 8, 2008, law enforcement officials from New Orleans went to Stallworth's home at 5801 Waterford in New Orleans, Louisiana. Stallworth stated in an affidavit that Pugh and Whitmore were living with her on that date. (Ct. R., Doc. 88-2, p. 1.)

When Lorrain arrived in New Orleans, task force members were outside the home with Stallworth. (Ct. R., Doc. 96, p. 19.) Lorrain provided facts to Edward Johnson, a task force

agent and Johnson prepared an affidavit to present to a judge for a search warrant for the home. (*Id.*, pp. 19-20.)  Lorrain testified that he told Stallworth that a murder had been committed and that a search warrant was being sought for her home in connection with these events.  (*Id.*, p. 20.) Lorrain also advised Stallworth that the officers needed to sweep the home to make sure there were no other persons were in the residence.  (*Id.*)  The search was conducted in Stallworth's presence, during which evidence was noted in particulars areas in the home.  (*Id.*, p. 21.)

Lorrain testified that the actual search of the home was not initiated until word was received from Johnson that the search warrant was signed at 2:10 A.M.  (*Id.*, p. 22.)  Lorrain stated that the search of the home was not begun until the warrant was signed.  (*Id.*)  The crime scene investigation report indicates that the technician arrived at the scene at 12:25 A.M., on October 9, 2008.  (Exh. D-3.)  According to the narrative of the investigation, Lorrain told New Orleans police officials that an individual had been murdered and another person was shot in Mississippi, and that the victims had allegedly been beaten, bound and kidnapped from Stallworth's home.  (*Id.*)  Following the search, Stallworth was provided a receipt for items collected in the search.  (*Id.*)

Stallworth stated she went to a convenience store at 10:00 P.M., where she was approached by an officer with the New Orleans Police Department.  (Ct. R., Doc. 96, p. 189.) The officer asked to accompany her to her home, and when they arrived at the house, several police cars were parked in the area of here home.  (*Id.*, p. 192.)  She stated that she was not allowed to move about the house.  (*Id.*, p. 195.)  She indicated that Lorrain seemed to be in charge of the operations at her home, and spent a good deal of time with her.  (*Id.*, pp. 197-203, 229.)

Lorrain called her on October 10, 2008, and allowed her to speak to her son. (*Id.*, p. 202.) Pugh was rambling and his mother was uncertain about what Pugh was trying to say to her. (*Id.*, p. 204.) Lorrain called Stallworth again that day, saying he needed to come back to her house to look for something. (*Id.*) Stallworth told him to meet at the house at a certain time, with Lorrain advising her not to go into the house and look around or she would be considered to tampering with evidence if she did. (*Id.*, p. 205.) She testified that she worked for a judge and knew "how the system works." (*Id.*, p. 219.)

She testified that she let the officers into her home and they found a large amount of cash in a sofa in the living room. (*Id.*, p. 207.) Stallworth signed a consent to search form. (*Id.*, p. 225; Exh. G-6.) She also signed a form acknowledging that the money was found and waiver of claim to the money. (*Id.*, pp. 207, 223; Exhs. G-7 and G-8.)

In the motion to suppress physical evidence, Pugh contends that the search conducted October 8 and 9, 2008, was not pursuant to a search warrant. (Ct. R., Doc. 67, p. 5.) Pugh contends that the officers began searching the Stallworth house shortly after 10:00 P.M., and the warrant was not signed until later. (*Id.*) Pugh claims that the officers were not authorized to enter the residence and conduct the search. (*Id.*)

Pugh asserts that the search on October 10, 2008, was not authorized by a search warrant and evidence discovered on this date must be suppressed. (*Id.*, p. 6.) Pugh contends that the October 10 search was not justified because of Stallworth's consent. (*Id.*) Any consent was not valid because it was acquiescence to law enforcement assertion of authority. (*Id.*, p. 7.) Pugh also claims that the items located on October 11, 2008, were the fruit of illegally obtained statements which tainted the location of the items. (*Id.*)

The search on October 10, 2008, at Stallworth's home was undertaken with Stallworth's consent, according to the United States. (Ct. R., Doc. 80. pp. 4-6.) Under the Fourth Amendment law, "[w]arrantless searches of a person's home are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search." *United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007). In considering whether a consent search is voluntary, the Court may look at to the age, education and intelligence of the person giving consent to the search; whether the person was under arrest; whether she was advised of her right to refuse consent to search; and her mental and physical condition. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). The Court, having observed Stallworth during her testimony at the suppression hearing, finds that she did voluntarily consent to the search of her home on October 10, 2008, when the money was discovered.

The items located on October 11, 2008, with Pugh's assistance would have been discovered by agents eventually. (Ct. R., Doc. 80, pp. 6-7.) Pugh signed another waiver of rights after being advised again of his rights prior to the search. (*Id*., p. 7 and its Exh. G.) There is no evidence that law enforcement officials coerced him into cooperating even though Pugh was advised to cooperate. *See United States v. Garcia Abrego*, 141 F.3d 142, 170 (5th Cir. 1998), *cert. denied* 525 U.S. 878. Pugh's actions evidence an uncoerced choice to waive his *Miranda* rights, and based on his experience, age, intelligence, and demeanor, the Court finds that choice was voluntarily and knowingly undertaken. *See United States v. Collins*, 40 F.3d 95, 98 (5th Cir. 1994), *cert. denied* 514 U.S. 1121; *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The Court further finds no reason to suppress the evidence found on October 11, 2008.

Refusing to sign a waiver form is not enough to establish that a defendant did not waive his rights. *North Carolina v. Butler*, 441 U.S. 369, 376 (1979). "[W]aiver may be direct or inferred from the defendant's words and actions." *See United States v. Chapa-Garza*, 62 F.3d 118, 121 (5th Cir. 1995). Merely answering question, however, is not enough to show a waiver of rights. *Chapa-Garza*, 62 F.2d at 121.

Waiver of rights is effective when law enforcement officers advised the accused that he did not have to discuss the case with them and the defendant agreed to discuss the case, he was familiar with the criminal justice system as evidenced by his criminal history, and he read the form and appeared to understand the form, although he refused to sign the waiver form. *See United States v. Collins*, 40 F.3d 95, 98 (5th Cir. 1994), *cert. denied*, 514 U.S. 1121 (1995). The Court finds that under these circumstances the Defendants' conduct establishes that they waived their rights during the interview. The Court, therefore, concludes that the motion for new trial based on a failure to suppress statements made by these defendants following their arrest should be denied.

After thorough review of the evidence and arguments, the Court finds that a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict. *United States v. Floyd*, 343 F.3d 363, 370 (5th Cir. 2003). These Defendants have presented no evidence to warrant a reversal of the Court's previous decision regarding the motion to suppress. The Court finds no error so significant or views the evidence so weak as to justify the granting of a new trial. Therefore, this Court finds that no miscarriage of justice has occurred by the rendering of

the jury verdict.  The verdict of guilt was justified by the testimony and inferences to be drawn therefrom.  The Court, therefore, finds that the Defendants' motions for new trial should be denied.  It is, therefore,

ORDERED AND ADJUDGED that the motions of Defendants Eddie James Pugh IV, Barron Lecour Borden, and Torenda Whitmore for new trial [147, 145, 141, respectively] be, and are hereby, denied.  It is further,

ORDERED AND ADJUDGED that the motions of Defendants Eddie James Pugh IV, Barron Lecour Borden, and Torenda Andrea Whitmore for judgment of acquittal [148, 144, 140, respectively] for judgment of acquittal be, and are hereby, denied.

SO ORDERED AND ADJUDGED, this the 11th day of September, 2009.


_____
                 *Walter J. Gex III*
UNITED STATES SENIOR DISTRICT JUDGE